IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

MICHAEL AVERY,

     Defendant.

CRIMINAL CASE NO.
1:22-cr-00092-SCJ-LTW-2

## FINAL REPORT AND RECOMMENDATION AND ORDER CERTIFYING THIS CASE READY FOR TRIAL

This matter is before the Court on Defendant Michael Avery's Motion to Suppress Evidence. [Docs. 108, 150, 152]. For the following reasons, the Court **RECOMMENDS** that the Motion be **DENIED**.

## BACKGROUND

**A.**    **Procedural Background**

Defendant Avery and four others are charged with conspiracy to possess and distribute controlled substances, as well as other offenses. [Doc. 1]. Defendant filed a Motion to Suppress Evidence on October 3, 2022. [Doc. 108]. An evidentiary hearing was held on January 31, 2023. [Doc. 141]. Defendant filed a Post-Hearing Brief on March 24, 2023. [Doc. 150]. On March 27, 2023, Defendant filed a Supplemental

Brief in which he requested a <u>Franks</u>[1] hearing.  [Doc. 152].  The Government filed a Response to Defendant's Motion to Suppress [Doc. 158], and Defendant filed his reply. [Doc. 165].

**B.**   **<u>Factual Background</u>**

In 2021, the Drug Enforcement Administration (DEA) was investigating narcotics trafficking in and around the Atlanta metropolitan area.  [Tr.[2] 11–12].  DEA Special Agent Bruce Hernandez conducted wiretap investigations into several individuals, including co-Defendant Deantay Turner.  [<u>Id.</u>].  The DEA intercepted Turner picking up multiple kilograms of cocaine and seized approximately $127,000 from Turner during a traffic stop.  [Tr. 12].  Intercepted communications from Turner's cellular phone revealed conversations between Turner and Defendant, in which they discussed Defendant traveling to certain locations, including Missouri and South Carolina, in exchange for money.  [Tr. 13].  Based on these conversations, Agent Hernandez suspected that Defendant was a courier for Turner.  [<u>Id.</u>].

On October 9, 2021, Agent Hernandez intercepted a call from Turner to Defendant, in which Turner asked if Defendant was interested in traveling to St. Louis

---

[1] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

[2] "Tr." refers to the transcript of the evidentiary hearing. [Doc. 143].

for $2,000.  [Tr. 16].  Agent Hernandez believed Turner's stated purpose of the trip—

"to pick up some shit"—was "coded conversation" for procuring narcotics.  [Tr. 18–

19].  Agent Hernandez intercepted follow-up calls, in which Turner indicated that the

plans had changed so Defendant should instead drive to Memphis to meet an unknown

courier, though the $2,000 payment would remain the same.  [Tr. 21].  Turner also

informed Defendant that he would provide gas money, to be picked up from Turner's

residence.  [Tr. 19-20].  Later that day, pole camera footage showed Defendant arriving

at Turner's residence, and then Agent Hernandez observed Defendant driving to a

nearby gas station in a white Acura.  [Tr. 22-23].  Following these communications and

observations, Agent Hernandez swore out an affidavit to obtain a warrant for

geolocation data from Defendant's cellular phone  to monitor Defendant's movements.

[Tr. 25].  The affidavit stated, "Based on the investigation to date, agents have

determined that [Defendant] is [Turner]'s primary drug/money courier."  [Doc. 152,

Ex. C].  Agent Hernandez testified that the geolocation data, together with an alert that

Defendant's vehicle was captured by a license plate reader in Memphis ([Tr. 26]),

corroborated his belief that Defendant was acting as a courier for Turner.  [Tr. 27].

On October 10, 2021, intercepted communications suggested that Defendant was

at a casino in Memphis and was attempting to meet the unknown courier.  [Tr. 28].

DEA agents did not actually observe Defendant conduct a narcotics transaction.  [Tr.

29].  Later that day, geolocation data indicated that Defendant's phone was traveling east from Memphis toward Atlanta.  [Tr. 28].  Based on this, Agent Hernandez believed that a narcotics transaction had occurred, and that Defendant was traveling back to Atlanta with narcotics.  [Tr. 28-29].

Agent Hernandez sought assistance from Georgia State Patrol ("GSP") to conduct an "enforcement operation and/or a traffic stop of [Defendant]."  [Tr. 30]. Agent Hernandez briefed other DEA agents and GSP troopers, including Troopers Harman and Bailey, who ultimately conducted the traffic stop.  [Id.].  During the briefing, Agent Hernandez explained the investigation and provided photographs of Defendant and his vehicle.  [Id.].  The attendees formulated a plan for the operation: DEA agents would be positioned along the highway in Alabama to identify Defendant's vehicle and alert GSP troopers, and GSP troopers would then obtain probable cause to conduct a traffic stop.  [Tr. 31-32].  Agent Hernandez preferred to conduct the traffic stop using a marked police unit due to safety concerns and to protect the covert nature of the DEA investigation.  [Tr. 32].

That afternoon, DEA agents positioned in Alabama observed Defendant's vehicle traveling eastbound on Interstate 20.  [Tr. 33].  Other agents watched the vehicle as Agent Hernandez communicated the location information to Trooper Harman, who was positioned on the median of Interstate 20 in Carroll County, Georgia.

4

[Tr. 34, 54].  As Defendant's vehicle approached and passed Trooper Harman, he noticed several equipment violations, including "extremely dark" tinted windows, tint on the rear taillights, and a tag cover that obstructed vision of the tag. [Tr. 57].  Trooper Harman also noted that the driver's side window was rolled halfway down, which he testified is a tactic to make the windows appear less tinted.  [Tr. 56].  Trooper Harman testified that these equipment violations would, by themselves, warrant a traffic stop. [Tr. 57].

Trooper Harman activated his blue lights and pulled over Defendant's vehicle. [Tr. 58].  At Trooper Harman's request, Defendant provided his driver's license and stepped out of the vehicle to see the rear taillights.  [Tr. 58–59].  Using a tint meter, Trooper Harman measured the windows and determined that the tint was below the legal limit.  [Tr. 62–63].  Additionally, Trooper Harman ran Defendant's information through a database, which indicated that Defendant had two active warrants and the vehicle was uninsured.  [Tr. 65].  Trooper Harman testified that, under Georgia law and his department's policy, uninsured vehicles must be towed, and the driver or owner should receive a citation.  [Tr. 66].  Defendant was not the owner of the Acura—he was borrowing it from Farida Skeete—so Trooper Harman gave Defendant a warning and issued the citation to Ms. Skeete.  [Tr. 76, 79, 91].

Trooper Harman further testified that when an individual is going to be separated from their vehicle, officers must conduct a vehicle inventory, pursuant to Georgia Department of Public Safety Policy 17.06. [Tr. 66–68; Gov't Ex. 7]. Here, there were two independent situations resulting in Defendant being separated from the vehicle; first, the vehicle needed to be towed because it was uninsured, and second, he was eventually arrested on one of the active warrants. [Tr. 69-70]. Trooper Harman conducted an inventory of the vehicle during which he discovered, among other things, two bundles of suspected narcotics. [Tr. 70–71]. Trooper Bailey transported Defendant to the Carroll County Jail, and Trooper Harman turned over the narcotics and other inventoried items to DEA agents. [Tr. 74].

## **LEGAL ANALYSIS**

Defendant argues there was no probable cause to initiate the stop. [Doc. 152 at 8–9; Doc. 165 at 6–7]. Defendant also argues the Court should grant a Franks hearing because the description of Defendant's role as Turner's "primary drug/money courier" in Agent Hernandez's warrant affidavit lacked sufficient factual support. [Doc. 152 at 7, 12; Doc. 165 at 5]. In response, the Government contends that Agent Hernandez's long-term investigation produced probable cause to stop and search Defendant's vehicle, which was imputed to Trooper Harman through the collective knowledge doctrine, and that the automobile exception permitted the warrantless search of the

vehicle.  [Doc. 158 at 7–11].  Alternatively, the Government contends that the traffic stop was supported by Trooper Harman's independent reasonable suspicion based on the perceived illegal window tint, and that the vehicle search was authorized by the Georgia Department of Public Safety inventory policy.  [Id. at 12–14].  Last, the Government argues the affidavit's description of Defendant's role is not materially false because if "primary" were removed, the remaining content in the affidavit is sufficient to support probable cause.  [Id. at 15–16].

**A.**    **Probable Cause or Reasonable Suspicion Supports the Traffic Stop and Search**

Defendant asserts that the traffic stop was unconstitutional because it was conducted without probable cause.  [Doc. 152].  Specifically, Defendant contends, "Agent Hernandez only had reasonable suspicion <u>not</u> probable cause that [Defendant] was traveling . . . with illegal narcotics."  [Id. at 8, 9] (emphasis in original).  Further, Defendant argues the collective knowledge doctrine is inapplicable because "the knowledge of the collective only amounted to reasonable suspicion."  [Doc. 165 at 6].  The Fourth Amendment protects individuals from "unreasonable searches and seizures."  U.S. Const. Amend. IV.  A traffic stop is "a seizure of the driver" within the meaning of the Fourth Amendment.  Brendlin v. California, 551 U.S. 249, 255 (2007).  A traffic stop is a reasonable seizure if it is supported by probable cause or reasonable suspicion.  United States v. Andres, 960 F.3d 1310, 1317 (11th Cir. 2020).

1.     **The Collective Knowledge Doctrine Applies to the Traffic Stop and Search**

To evaluate probable cause or reasonable suspicion, a court may consider the collective knowledge of all officers involved in an operation if the officers "maintained at least a minimal level of communication during their investigation." United States v. Willis, 759 F.2d 1486, 1494 (11th Cir. 1985). Where at least minimal communication is present, "[a] court may aggregate multiple officers' knowledge and consider probable cause collectively." United States v. Sullivan,  717 F. App'x 946, 950 (11th Cir. 2017).

Here, Agent Hernandez communicated with GSP Troopers before and during the operation.  At the briefing prior to the operation, Agent Hernandez provided background information on the investigation, including the recently intercepted communications between Defendant and Turner and the suspected purpose of Defendant's trip to Memphis. [Tr. 30, 53].  Additionally, Agent Hernandez informed the GSP troopers of the plan for the operation, so they were aware of their role in advance.  [Tr. 31–32].  During the operation, as DEA agents tracked Defendant's vehicle, they shared updates of Defendant's location using a WhatsApp group and push-to-talk radio.  [Tr. 33–34].  Agent Hernandez then relayed this information in real time to Troopers Harman and Bailey.  [Tr. 34–35, 55].

Thus, the DEA agents and GSP troopers involved in the operation maintained continuous communication that reaches the level required to apply the collective knowledge doctrine.[3]  See Andres, 960 F.3d at 1317 (applying the collective knowledge doctrine where the officer conducting the stop "was in constant contact with the officers involved in the investigation of [the defendants], was briefed earlier in the day about the 'buy-bust' operation, and knew the description and tag of the vehicle [the defendant] would be driving").  Consequently, the collective knowledge of the DEA agents and GSP troopers may be considered in determining whether probable cause existed for the traffic stop and search of Defendant's vehicle.

**2.   Probable Cause Supported the Traffic Stop and Subsequent Search of the Vehicle**

"Law enforcement officers have probable cause to arrest when the facts and circumstances within their collective knowledge, 'or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense.'"  United States v. Wall, 343 F. App'x 564, 567 (11th Cir. 2009) (quoting Craig v. Singletary, 127 F.3d 1030, 1042 (11th Cir.

---

[3] Defendant does not appear to contest that there was at least minimal communication between the officers.  Instead, Defendant argues "the knowledge of the collective only amounted to reasonable suspicion."  [Doc. 165 at 6].  This argument is addressed below.

1997)).  Probable cause is "an objectively reasonable standard under the totality of circumstances," United States v. Hyppolite, 609 F. App'x 597, 604 (11th Cir. 2015), and "is a doctrine of reasonable probability and not certainty."  Craig, 127 F.3d at 1042 (quoting United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995)).

Here, information within the collective knowledge of the officers established probable cause that Defendant was transporting narcotics on behalf of Turner.  Through wiretap investigations, the interception of Turner picking up multiple kilograms of cocaine, and the seizure of $127,000 from Turner at a traffic stop, the DEA had strong evidence that Turner was involved in the distribution of narcotics.  [Tr. 11–12].  Intercepted calls between Turner and Defendant in August and September of 2021 involved money and suggested Defendant was traveling to and from Missouri and South Carolina.  [Tr. 13].  On October 9, 2021, DEA agents intercepted calls in which Turner asked Defendant to travel to Memphis to "pick up some shit" in exchange for $2,000.  [Tr. 13, 16, 18].  During these calls, Defendant indicated acceptance of Turner's requests.  [Gov't Exs. 2, 3].

Additionally, Turner instructed Defendant to pick up gas money at his residence [Tr. 19-20], and later that day, DEA agents observed Defendant arrive at Turner's residence and then drive to a nearby gas station.  [Tr. 22–23].  Defendant's vehicle was captured by a license plate reader in Memphis ([Tr. 26]), and intercepted

communications and geolocation data from Defendant's phone showed that Defendant had arrived in Memphis and was attempting to contact a third party at a casino. [Tr. 27–28]. Eventually, geolocation data indicated Defendant was leaving Memphis and traveling east toward Atlanta. [Tr. 28–29]. Agent Hernandez testified that based on his experience and training,[4] this movement "signified . . . that a suspected narcotics transaction had in fact occurred," and that Defendant "was traveling back towards [Georgia] with suspected narcotics." [Tr. 29].

Defendant argues the officers did not have probable cause because DEA agents never "actually surveilled a narcotic transaction between [Defendant] and another individual in Memphis." [Doc. 152 at 8; Doc. 165 at 4]. This argument is unavailing because "the standard is not actual knowledge, it is probable cause," United States v. Romero, No. 1:21-CR-394-MHC-CCB, 2023 WL 3984659 at *7 (N.D. Ga. Apr. 28, 2023), and "probable cause itself is a doctrine of reasonable probability and not certainty." Craig, 127 F.3d at 1042 (quoting Magluta, 44 F.3d at 1535). Further, "[o]fficers can develop probable cause based on coded communications arranging a

---

[4] "In determining if such a reasonable belief exists, we may consider the involved officers' experience, because '[c]onduct innocent in the eyes of the untrained may carry entirely different "messages" to the experienced or trained observer.'" United States v. Wall, 343 F. App'x 564, 567 (11th Cir. 2009) (quoting United States v. Gonzalez, 969 F.2d 999, 1003–04 (11th Cir. 1992)).

drug transaction and a vehicle's movement, even if the drug transaction is not directly observed." United States v. Guzman, No. 1:17-CR-405-TWT-LTW, 22018 WL 7361073 at *8 (N.D. Ga. Dec. 13, 2018). The information here—Turner's known involvement in narcotics distribution, the intercepted conversations between Turner and Defendant, and the fact that Defendant's behavior and movement was consistent with Turner's requests—would have led a prudent person to believe that Defendant traveled to Memphis on behalf of Turner to acquire narcotics and was transporting the narcotics back to Turner's residence. Accordingly, Trooper Harman had probable cause to stop Defendant's vehicle.

The search of Defendant's vehicle was also supported by probable cause. The Fourth Amendment typically requires law enforcement to obtain a warrant prior to conducting a search, but a warrantless search may be justified under the automobile exception. United States v. Marsh, 663 F. App'x 888, 891 (11th Cir. 2016). "The automobile exception allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile; and (2) the police have probable cause for the search." United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007). The first prong "is satisfied merely if 'the automobile is operational.'" Id. (quoting United States v. Watts, 329 F.3d 1282, 1286 (11th Cir. 2003)). The second prong is present when "there is a fair

probability that contraband or evidence of a crime will be found in the vehicle." Id. (quoting United States v. Tamari, 454 F.3d 1259, 1264 (11th Cir. 2006)).

The first prong is easily met here because the vehicle was being operated at the time it was stopped.  See Marsh, 663 F. App'x at 892.  The second prong is also met because, as discussed above, the information within the collective knowledge of the DEA agents and GSP troopers[5] gave rise to a fair probability that Defendant's vehicle contained contraband.  See id. (finding probable cause to search where the defendant communicated with a known narcotics dealer, retrieved a bag from a hotel that he had discussed with the dealer, and subsequently called and met with the dealer); United States v. Willix, 723 F. App'x 908, 911 (11th Cir. 2018) (finding probable cause to search where agents arranged a delivery of a package containing narcotics, the defendant arrived expecting the package, and the defendant fled when approached by officers).  Therefore, in this case, Trooper Harman had probable cause to search Defendant's vehicle under the automobile exception.

---

[5] "Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search." Marsh, 663 F. App'x at 893 (quoting United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002)).

**3.** **Alternatively, the Stop and Search of the Vehicle Were Supported by Trooper Harman's Independent Probable Cause and the Inventory Policy**

A traffic stop is reasonable, and therefore constitutional, "if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[6]." United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008). "In evaluating both traffic and Terry stops, we examine (1) whether the officer's action was justified at its inception—that is, whether the officer had probable cause or reasonable suspicion to initiate the stop, and (2) whether the stop was reasonably related in scope to the circumstances that justified it in the first place." United States v. Gibbs, 917 F.3d 1289, 1294 (11th Cir. 2019).

The facts here support probable cause to stop Defendant's vehicle for a traffic violation. A "police officer may stop a vehicle 'when there is . . . probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations' relating to the operation of motor vehicles." Hyppolite, 609 F. App'x at 604–05 (quoting United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990)). The Eleventh Circuit "ha[s] recognized a traffic stop was supported by probable cause, where an officer believed the window tinting of a vehicle was in

---

[6] Terry v. Ohio, 392 U.S. 1 (1968).

violation of Florida legal limits." Id. at 605 n.5 (citing United States v. Weaver, 145 F. App'x 639, 641 (11th Cir. 2005); see also United States v. Sims, No. 20-12774, 2022 WL 4128605 at *5 (11th Cir. Sept. 12, 2022) ("Under Florida law, driving with illegally tinted windows is a violation and serves as a valid basis for a traffic stop."). Driving with illegally tinted windows is a violation of Georgia law, and just like the Georgia statute, the Florida statutes at issue in Weaver and Sims defined the legal limit of window tint using a threshold percentage of light transmission. See O.C.G.A § 40-8-73.1; Fla. Stat. §§ 316.2953–54.

Trooper Harman noticed that the windows on Defendant's vehicle were "extremely dark"[7] and that the driver's side window was rolled down, a concealment tactic that he recognized based on his prior experience. [Tr. 56–57]. Additionally, Trooper Harman testified that he believed the vehicle's taillights were tinted because he was only able to see the vehicle's brake lights in the shade, and not in the sunlight. [Tr. 61]. These facts and circumstances "were 'sufficient to cause a person of reasonable caution to believe' that a traffic infraction had been committed," Sims,

---

[7] Defendant notes that the windows of his Acura car looked "just as dark" as the windows of the Ford car in the adjacent lane when Trooper Harman initiated the stop. [Doc. 152 at 10]. Defendant questions, "How does the tint on the white 2004 Acura give rise to probable cause of an equipment violation while the tint on the Ford Mustang did not?" [Id. at 11]. The possibility that probable cause exists for another vehicle does not preclude the existence of probable cause for Defendant's vehicle.

2022 WL 4128605 at *15 (quoting  United States v. Pierre, 825 F.3d 1183, 1192 (11th

Cir. 2016)), and thus Trooper Harman had probable cause to stop Defendant.[8]  See

Sims, 2022 WL 4128605 at *15 (finding probable cause where the officer noticed dark

tints on a rental car, and knew from prior experience that rental car companies do not

typically allow tinted windows); Pierre, 825 F.3d at 1192 (finding probable cause

where the officer could not see inside the car as he approached it because of the

darkened windows); Weaver, 145 F. App'x at 642 (finding probable cause where the

officer's headlights reflected off the car and the officer could not see the dashboard

lights or driver's silhouette through the windows).[9]

As to the second inquiry, the Eleventh Circuit has identified four factors for

determining if the scope if the stop was reasonable: "the law enforcement purposes

served by the detention, the diligence with which the police pursue the investigation,

the scope and intrusiveness of the detention, and the duration of the detention." United

States v. Acosta, 363 F.3d 1141, 1146 (11th Cir. 2004).  For the first factor—law

---

[8] This conclusion is further supported by the fact that the window tint meter found that the windows were in fact illegally tinted.  Sims, 2022 WL 4128605 at *15.

[9] These facts and circumstances also support reasonable suspicion of criminal activity, which would also justify the stop. See United States v. Alvarez, No. 22-20221, 2023 WL 2475435 at *2 (S.D. Fl. Mar. 12, 2023) (holding that the officer "had reasonable suspicion that Defendant was 'about to be involved in' the criminal activity of operating a vehicle with too-darkly-tinted windows").

enforcement purposes served—the most important consideration is whether the officers "pursue[d] a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference." Id. (quoting United States v. Gil, 204 F.3d 1347, 1351 (11th Cir. 2000)).  The stop may be used to "engage in brief and nonintrusive investigation techniques, such as noncustodial questioning." Id. (quoting United States v. Hardy, 855 F.2d 753, 759 (11th Cir. 1988)).  Trooper Harman asked Defendant for his driver's license, asked about the window and taillight tints, and measured the windows with the tint meter.  [Tr. 58-63].  These questions were brief and nonintrusive, and the tint meter was a quick way to confirm or dispel Trooper Harman's suspicion that the tint was illegal.

For the second factor—diligence—courts consider "whether the methods the police used were carried out without unnecessary delay." Acosta, 363 F.3d at 1146. Trooper Harman performed standard traffic stop investigatory methods and there is no indication in the record that Trooper Harman did so with any unnecessary delay. "Beyond issuing a traffic ticket, the mission of a traffic stop can include checking the driver's license, searching for outstanding warrants against the driver, and checking the vehicle's registration and proof of insurance." Sims, 2022 WL 4128605 at *5.  After initiating the stop, Trooper Harman promptly asked Defendant for his driver's license, showed Defendant the tint on the taillights, measured the windows with a tint meter,

ran Defendant's information, and discovered that the vehicle was uninsured, and that Defendant had active warrants.  "Each investigatory act logically led to the next act which was done without delay." Acosta, 363 F.3d at 1146.

The third factor assesses whether the scope and intrusiveness of the detention exceeded the amount reasonably needed to ensure officer safety. Id.  Trooper Harman asked Defendant to get out of the vehicle to see the tint on the taillights, which was "a minimal restriction on Defendant's movement and does not transform the Terry stop into an arrest." Guzman, 2018 WL 7361073 at *10; see Maryland v. Wilson, 519 U.S. 408, 412 (1997) (holding that it is reasonable for an officer to direct a driver to step out of the vehicle during a traffic stop).  Defendant was stopped on a busy public highway and Troopers Harman and Bailey did not draw their weapons or use physical force. Guzman, 2018 WL 7361073 at *10.

The final factor asks whether the duration of the stop was reasonable. Acosta, 363 F.3d at 1147.  There is no bright line rule; rather "[t]he test is one of 'common sense and ordinary human experience.'" Id.  The time between the initiation of the stop and the discovery of narcotics in the vehicle was approximately twelve minutes. This amount of time is reasonable in light of the purpose of the stop, the investigatory methods used, and the information gained through investigation—namely running Defendant's information through the database, which revealed the active warrants and

18

that the vehicle was uninsured, which then necessitated an inventory search of the vehicle.  Twelve minutes is reasonable under Eleventh Circuit precedent.  See id. at 1148 (approving a thirty-minute stop); United States v. Hernandez, 418 F.3d 1206, 1211 (11th Cir. 2005) (approving a seventeen-minute stop); see also United States v. Heath, 622 F. App'x 843, 846 (11th Cir. 2015) (approving a thirty-minute stop).  Based on these factors, the Court finds that the scope of the traffic stop was reasonable.

After the initial stop, the subsequent search of Defendant's vehicle was justified as an inventory search.  "[P]olice officers may carry out warrantless inventory searches of vehicles, provided that the search is conducted 'pursuant to explicit and comprehensive procedures . . . .'"  United States v. Jefferson, 451 F. App'x 833, 834–35 (11th Cir. 2011) (quoting United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991)).  A proper inventory search requires "first, that the officers had the authority to impound the defendant's vehicle, and second, that the officers complied with departmental policy in conducting the search."  Id.  Here, Trooper Harman testified that the search was conducted pursuant to the Georgia Department of Public Safety Policy 17.06,[10] which addresses removal of vehicles.  [Tr. 66–68; Gov't Ex. 7].

---

[10] Policy 17.06.4(G)(4)(a) states, "Inventories shall be conducted under the following circumstances: Whenever a member arrests the driver/owner of a vehicle and the arrest involuntarily separates the driver/owner from their vehicle, unless the vehicle

Trooper Harman further testified that there were two bases for conducting the inventory search—first, his department's policy provided that uninsured vehicles must be towed, which would separate Defendant from the vehicle ([Tr. 66]), and second, Defendant was arrested on one of the active warrants, which also would separate him from the vehicle.  [Tr. 69–70].

As to the first basis, Trooper Harman testified that Georgia law and his department's policy provide that uninsured vehicles must be towed, and Defendant did not contest this.  [Tr. 66].  See United States v. Khoury, 901 F.2d 948, 958 (11th Cir.), *opinion modified on other grounds*, 910 F.2d 713 (11th Cir. 1990) (holding that a department's inventory policy can be established solely through an officer's "uncontroverted" testimony that "the inventory search was routine and required").  Policy 17.06 supports the second basis and gave Trooper Harman the authority to impound the vehicle.  See Gov't Ex. 7.  Further, Trooper Harman conducted the search in compliance with Subsection 17.06.4(G)(4) because Defendant, the driver of the vehicle, was going to be arrested, which involuntarily separated him from the vehicle.  In addition, Trooper Harman testified that the vehicle could not have been released to a custodian because it did not have insurance and there was no known custodian within

_____

is released to the control of a custodian designated by the driver/owner at the time of the arrest."

20

a reasonable distance.  [Tr. 69].  For these reasons, the Court finds that the search of Defendant's vehicle was a proper inventory search.

## B.    **Warrant Affidavit**

Defendant requests a <u>Franks</u> hearing based on the statement in Agent Hernandez's warrant affidavit that Defendant was Turner's "primary" drug/money courier.  [Doc. 152 at 11-12].  Defendant contends that this statement was false because "Agent Hernandez could not testify to a previous drug/money courier transaction occurring between [Defendant] and Mr. Turner."  [<u>Id.</u> at 12].

A defendant is entitled to a hearing under <u>Franks</u> if he can show "(1) that information contained in an affidavit was untrue, (2) that inclusion of the untrue information was either deliberate or in 'reckless disregard for the truth,' and (3) that the untrue information was an essential element of the probable cause showing relied upon by the judicial officer in issuing the search warrant."  <u>O'Ferrell v. United States</u>, 253 F.3d 1257, 1267 (11th Cir. 2001).  "If the allegedly false material is set aside, and 'there remains sufficient content in the warrant affidavit to support a finding of probable cause,' the warrant is valid."  <u>Sorrow v. City of Atlanta</u>, No. 20-14723, 2022 WL 2784603 at *3 (11th Cir. July 15, 2022) (quoting <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1326 (11th Cir. 1997)).

Even if it was untrue that Defendant was Turner's "primary" courier, the remaining content in the affidavit is sufficient to support a finding of probable cause. The affidavit discussed the series of investigations that led to the identification of Defendant and the recent findings that brought Agent Hernandez to seek the warrant, including the intercepted communications and video surveillance of Defendant. [Doc. 152, Ex. C]. This remaining content supports the assertion that Defendant was acting as a courier, and specifically that Defendant was planning to acquire and transport narcotics on Turner's behalf. "In light of the facts presented in the affidavit . . . it is difficult to imagine that the U.S. Magistrate Judge would not have found probable cause existed under any circumstance . . . ." United States v. Norwood, No. 1:20-cr-00488-SDG-JSA, 2022 WL 278789 at *6 (N.D. Ga. Jan. 28, 2022). Further, Defendant did not even allege that Agent Hernandez included the "primary" statement "knowingly and intentionally, or with reckless disregard for the truth." Franks, 438 U.S. at 155. "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Franks, 438 U.S. at 171. Thus, Defendant has failed to make the necessary showing to justify a Franks hearing.

Defendant argues, for the first time, in his reply brief that the statement that Defendant was Turner's "drug/money courier" was a reckless misrepresentation

because Agent Hernandez had not "confirmed whether any drug/money conveyance even occurred on September 1, 2021." [Doc. 165 at 5]. The Court need not consider arguments raised for the first time in a reply brief. See Kellner v. NCL (Bahamas), Ltd., 753 F. App'x 662, 667 (11th Cir. 2018). Even if Defendant had raised this argument in his initial brief, he still would not be entitled to a Franks hearing. Setting aside the evidence from September 1, 2021, the evidence obtained on October 9, 2021—including the intercepted calls and surveillance—is a sufficient basis for Agent Hernandez's statement that Defendant was Turner's drug/money courier. See United States v. Votrobek, 847 F.3d 1335, 1343 (11th Cir. 2017).

## CONCLUSION

For these reasons, the Court **RECOMMENDS** that Defendant Avery's Motion to Suppress Evidence [Docs. 108, 150, 152] be **DENIED**. There are no other pending matters before the Magistrate Judge with respect to this case and the undersigned is aware of no problems relating to the scheduling of this case. **IT IS FURTHER ORDERED** and **ADJUDGED** that this action is declared Ready for Trial.

**IT IS SO ORDERED, REPORTED, AND RECOMMENDED**, this 17 day of July, 2023.

_____
LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE

shall be served upon the opposing party.  The party filing objections will be responsible for obtaining and filing the transcript of any evidentiary hearing for review by the District Court.  **If no objections are filed, the Report and Recommendation may be adopted as the opinion and order of the District Court, and on appeal, the Court of Appeals will deem waived any challenge to factual and legal findings to which there was no objection**, subject to interests-of-justice plain error review.  Harrigan v. Metro Dade Police Dep't Station #4, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 11th Cir. R. 3-1 ("A party failing to object to a magistrate judge's findings or recommendations . . . waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object.").

The Clerk is **DIRECTED** to submit the Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED AND DIRECTED**, this  17  day of July, 2023.


LINDA T. WALKER
UNITED STATES MAGISTRATE JUDGE


2